### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RONALD GIBSON,** | **Civil Action** |
| *Petitioner*, | |
| *v.* | **No. 11-cv-4550** |
| **JOHN E. WETZEL,** | |
| *Respondent*. | |

### <u>MEMORANDUM OPINION</u>

**GOLDBERG, J.**                                                    **APRIL 17, 2024**

 Before me is Petitioner Ronald Gibson's petition for a writ of habeas corpus. Gibson has challenged his 1991 conviction in the Court of Common Pleas of Philadelphia County for two counts of first degree murder and one count of robbery, for which he received the death penalty. The case was originally assigned to the Honorable Darnell Jones, II.

 Following various procedural delays—including discovery, an interlocutory appeal, and a stay for Gibson to exhaust claims in state court—Respondent, represented by the Philadelphia District Attorney's Office (DAO), conceded that Gibson was entitled to habeas relief as to the death penalty, based on trial counsel allegedly having performed ineffectively in failing to present mitigating evidence of Gibson's chaotic and often neglected childhood, drug use, and alcohol consumption. After a phone conference with counsel, Judge Jones determined that Gibson's Sixth Amendment right to counsel was violated and granted habeas relief as to the death penalty only without resolving Gibson's other challenges to his conviction. My review of the docket reflects that this conference was apparently held off the record and that Judge Jones never issued an opinion explaining his reasons for granting this relief. The case was then reassigned to my docket.

The DAO answered Gibson's petition on August 8, 2022, conceding that Gibson was entitled to a hearing on at least two of his claims (Grounds Four and Eleven) and not addressing Gibson's nine other claims. Before I issued a ruling on whether a hearing would be scheduled, Gibson filed a motion for summary judgment on one of his claims—Ground Five—arguing that the undisputed facts show he is entitled to relief on that ground without a hearing. Gibson's Ground Five asserts that his Due Process rights were violated by a jury instruction on accomplice liability that allegedly allowed his conviction for first degree murder as an accomplice to robbery, even in the absence of a specific intent to kill.

In initially opposing Gibson's motion for summary judgment, the DAO did not address the merits but argued only that Ground Five was procedurally defaulted because Gibson did not raise it in state court. At oral argument, the DAO changed its position and conceded that the claim could be heard on the merits, and I directed the parties to submit additional briefing.

The DAO's first supplemental brief did not defend the accuracy of the accomplice liability instruction but instead argued that Gibson's motion should be denied because any error was harmless. The DAO noted that the prosecutor never asked the jury to find Gibson guilty of first degree murder as an accomplice to robbery, and that, in any event, there was overwhelming evidence that Gibson was the actual shooter.

Because the DAO had still not addressed whether the accomplice liability instruction was erroneous, I directed the parties to submit further briefing on that question. In its latest brief, the DAO concedes that the accomplice liability instruction was improper and that the Pennsylvania Supreme Court violated clearly established federal law in concluding otherwise. Nevertheless, the DAO maintains that the error was harmless, and urges that Ground Five be denied.

For the reasons set out below, I conclude that even if there was error in the accomplice liability instruction, it was harmless.[1] Consequently, for the following reasons, Gibson's motion for summary judgment will be denied.

## I.      **FACTS**

The facts of this case, as set out in the transcript of Gibson's two-week jury trial, are somewhat difficult to follow and stem from a shooting that occurred in a bar called Woody's Playhouse at 57th Street and Woodland Avenue in Philadelphia on the evening of December 24, 1990. Gibson was convicted of murdering two bar patrons—Freddie Dukes and Vernae Nixon—and of robbing bouncer Keith Simmons. At trial, Gibson and the DAO agreed on some of the facts regarding how the shooting took place but disagreed as to which individual—Gibson or one of his cohorts—shot and killed the victims. The jury ultimately convicted Gibson of both murders and the robbery.

Late evening on December 24, 1990, Gibson and another individual, Gregory Tancemore, entered the bar. (N.T. 10/3/91 at 78-79 (Pettaway); N.T. 10/7/91 at 80-82 (Gibson).) There was evidence that a third individual, David Green, drove to the bar with Gibson and Tancemore, but the parties offered conflicting testimony as to whether Green went into the bar with the others or stayed behind in the car. The DAO's witnesses described only Gibson and Tancemore coming into the bar and no prosecution witness testified to seeing Green in the bar. (See, e.g., N.T. 10/3/91 at

---

[1] Determining whether the accomplice liability charge was in fact erroneous would involve an inquiry into whether the state court addressed the merits of Gibson's due process claim such that deference applies pursuant to § 2254(d), whether the Third Circuit's decision on a similar jury instruction but under a de novo standard of review is controlling, see Laird v. Horn, 414 F.3d 419, 428 (3d Cir. 2005), and whether prior Supreme Court precedent holding that jury instructions must require the prosecution to prove all elements of the crime beyond a reasonable doubt, e.g., Osborne v. Ohio, 495 U.S. 103, 124-25 (1990), addressed the "specific question presented by this case" or only confronted the issue on a "high level of generality." Lopez v. Smith, 574 U.S. 1, 6 (2014). Because I conclude any error here was harmless, I need not answer these more difficult questions.

79 (Pettaway).) Gibson, however, testified that all three of them—himself, Tancemore, and Green—went in together. (N.T. 10/7/91 at 82.)

Gibson and Tancemore ordered drinks. (N.T. 10/3/91 at 79 (Pettaway); N.T. 10/7/91 at 83 (Gibson).) The parties agreed that Gibson then went to the back of the bar, near the bathroom, and engaged in a physical struggle with a bouncer, Keith Simmons. But Gibson and the DAO's witnesses gave conflicting accounts of how the struggle began. According to Simmons, Gibson put a gun to his stomach, and Simmons reacted by grabbing the gun. (N.T. 10/3/91 at 123.) The DAO's theory was that Gibson pointed a gun at Simmons because Gibson and Tancemore were conspiring to rob the bar. Importantly, Gibson acknowledged that he carried a gun in the bar that night, but testified that it was "down in [his] pants" and he did not point it at Simmons. Instead, Gibson's explanation for the fight was that as he walked into the bathroom and opened his jacket, Simmons spotted the gun, causing a struggle to ensue with Simmons. (N.T. 10/7/91 at 85-86.)

Simmons described Gibson's gun as "a .45" with a clip rather than a revolver. (N.T. 10/3/91 at 123, 143.) Simmons testified he could identify the gun because he had "seen a .45 before." (N.T. 10/3/91 at 138.) On cross examination, defense counsel questioned Simmons about a statement to police given a few hours after the incident, in which Simmons described Gibson's gun as "a black gun" "with a clip" "like a .45," suggesting that Simmons increased his confidence from "like a .45" to "a .45" between then and trial. (N.T. 10/3/91 at 145-46.) In his testimony, Gibson disagreed with Simmons's identification of the gun, which Gibson described as a ".38 automatic nickel plate." (N.T. 10/7/91 at 85.)

Another bouncer, Sam Zeigler, testified that he attempted to help Simmons by grabbing Gibson's gun. (N.T. 10/4/91 at 6.) Witnesses on both sides agreed that while Gibson, Simmons, and Zeigler were struggling over Gibson's gun in the back of the bar, Tancemore started shooting

from the front of the bar, and Gibson used the opportunity to break free of Simmons and Zeigler. (N.T. 10/3/91 at 84, 90 (Pettaway), 123-24 (Simmons); N.T. 10/7/91 at 87 (Gibson).) Gibson then ran toward the front of the bar with his gun. (N.T. 10/7/91 at 87 (Gibson).)

One of the bar patrons, Freddie Dukes, was an off-duty police officer carrying his gun that night. There was testimony that, as Tancemore was shooting from the front of the bar, Dukes attempted to reach for his own gun. (See N.T. 10/4/19 at 8-9.) No witness testified that Dukes fired his gun, and no ballistics evidence from Dukes's gun was found in the bar.

At this point, accounts once again diverge. The DAO put on four witnesses—Princess Pettaway, Keith Simmons, Sam Zeigler, and Prince Parker—who all testified to witnessing Gibson shoot a gun from the front of the bar near where Tancemore was shooting. Their testimony was as follows:

First, Pettaway, who was working in the bar that night, testified she saw Gibson and Tancemore both shooting. (N.T. 10/3/91 at 90.) On cross examination, defense counsel read Pettaway's statement to police in which she said Tancemore "did the shooting" and she was "not sure" whether Gibson fired any shots. (N.T. 10/3/91 at 102, 106.) Pettaway attempted to explain this statement by testifying that she saw both Tancemore and Gibson pointing their guns but she could not say which gun the shots came from. (N.T. 10/3/91 at 109.)

Next, Simmons, the bouncer who struggled with Gibson, also testified that he saw both Tancemore and Gibson standing near the front of the bar and firing their guns. (N.T. 10/3/91 at 125.) On cross examination, defense counsel read a police interview in which Simmons identified a photo of Tancemore as "the big guy who shot" one of the victims. (N.T. 10/3/91 at 150.)

Third, Sam Zeigler, who had attempted to help Simmons grab Gibson's gun, testified that he saw Gibson shooting. (N.T. 10/4/91 at 8-9.) Parts of Zeigler's statement to police were read on cross examination, but none contradicted his trial testimony that Gibson shot a gun.

Finally, Prince Parker was an off-duty police officer who was in the bar playing Pac-Man when the shooting began. Parker heard gunshots and dove to the floor, then looked toward the front of the bar and saw Gibson shoot "two or three more times." (N.T. 10/4/91 at 45-48.) Prior to trial, Parker was unable to identify Gibson from a photo array, but expressed confidence in his in-court identification. (N.T. 10/4/91 at 51.)

Gibson gave a quite different account. According to Gibson, it was Green who stepped out from behind a cigarette machine, pulled out a gun, and started shooting along with Tancemore. While Green was shooting, Gibson claimed he ran out of the bar. (N.T. 10/7/91 at 87-88.) Gibson denied shooting his gun, and also denied having any intention of robbing anyone. (N.T. 10/7/91 at 88, 90.)

The Commonwealth offered ballistics evidence to demonstrate that both victims were killed by .45 caliber bullets from Gibson's gun. Bullets and fired cartridges of two types were found throughout the bar: .45 caliber automatic (like the gun Gibson allegedly carried) and 9 mm (like Tancemore's gun). (See, e.g., N.T. 10/3/91 at 173.) There was no testimony that any bullets or cartridges from a .38 caliber automatic (the gun Gibson claims to have carried) were found. Three .45 caliber cartridges and two .45 caliber bullets were found on the floor of the bar. (N.T. 10/3/91 at 173-74.) The third .45 caliber bullet was found in the body of one of the victims (Freddie Dukes).[2] Three 9 mm cartridges were found. (N.T. 10/3/91 at 173-74.) But only one 9 mm bullet

---

[2] There are pages missing from the trial transcript supplied by the DAO, resulting in a gap that cuts off the Commonwealth's expert's identification of the ballistics evidence. Based on the summary of the evidence from the Pennsylvania Supreme Court, which Gibson does not presently dispute,

was found in the bar, which had passed through the ceiling into the second floor. (N.T. 10/3/91 at 173-75.) Another 9 mm bullet was found in the Police Administration Building on the floor of a bathroom that had been used by witnesses from the bar, and the DAO argued it must have fallen out of a witness's clothing. (10/4/91 at 132-33; 181-82.) It does not appear the third 9 mm bullet was ever found. (N.T. 10/3/91 at 23 (Commonwealth's opening statement)[3].) Two holes, one in the bar's drop ceiling and one above the men's room door, were found and believed to correspond to two shots from the 9 mm gun—although, as noted, a bullet was only found for the second hole. (N.T. 10/3/91 at 170-71, 181.)

Two bar patrons were killed: Freddie Dukes and Vernae Nixon. Nixon had two bullet wounds, one to the arm and one to the chest. The medical examiner testified that Nixon's wounds were likely made by the same bullet. (N.T. 10/7/91 at 9-10.) No bullet was recovered from Nixon's body. (N.T. 10/7/91 at 10.) Freddie Dukes had three bullet wounds, two of which could have come from the same bullet. (N.T. 10/7/91 at 11-13.) Dukes had a bullet lodged near his aorta, which had punctured the aorta and eventually caused him bleed to death. (N.T. 10/7/91 at 12, 21-22.) There was testimony that the bullet wounds in both deceased victims would have been caused by large caliber bullets, .38 or larger. (N.T. 10/7/91 at 12-13.) The medical examiner acknowledged that, based on the wounds alone, 9 mm bullets could not be excluded. (N.T. 10/7/91 at 15-16.) The firearms expert testified that for two of the .45 caliber bullets to end up on the floor as they did, they must have passed through something soft, like human flesh, to lose velocity. (N.T. 10/4/91 at 188.) As noted, the bullet recovered near Dukes's aorta was .45 caliber.

---

the bullet recovered from the victim was determined to be .45 caliber. Commonwealth v. Gibson, 688 A.2d 1152, 1157 (Pa. 1997).

[3] There is a gap in the transcript supplied by the DAO that cuts off some of the testimony regarding the 9 mm ballistics evidence.

Tancemore was later found dead, apparently by suicide, in possession of a 9 mm semiautomatic handgun. (N.T. 10/4/91 at 92, 155.) The .45 caliber gun believed to belong to Gibson was found in a bureau in an apartment occupied by David Green. (N.T. 10/4/91 at 130-31, 140.) There was testimony that the .45 caliber ballistics evidence (bullets and cartridges) either matched, or, in some cases, was consistent with, the .45 caliber gun found in Green's apartment. (N.T. 10/4/91 at 185-89.) A .38 caliber revolver was also found under Green's mattress. (N.T. 10/4/91 at 147.)

As part of its case in chief, the Commonwealth read a signed statement by Gibson in which he confessed to owning the .45 caliber gun, shooting it in the bar, and later placing it in Green's apartment under a mattress.[4] (N.T. 10/7/91 at 52-54.) In the same statement, Gibson also identified the specific .45 caliber gun recovered from Green's apartment as the one he shot in the bar. (N.T. 10/7/91 at 54.) Gibson did not confess to hitting anyone with these shots, but did speculate that the .45 caliber gun must be "the murder weapon." (N.T. 10/7/91 at 54.)

Gibson denied the accuracy of his signed confession, explaining that he only signed it because the detective beat him. (N.T. 10/7/91 at 99, 102.) Specifically, Gibson claimed that the detective punched him in the mouth and stomach, twisted his arm, kicked him, and handcuffed him to the chair. (N.T. 10/7/91 at 101, 104.) Gibson further testified that his lip was bleeding from being beaten but that the blood might not appear in a photograph because he washed it off. (N.T. 10/7/91 at 151-52.) A medical technician from the police detention unit testified that Gibson was documented as having no visible injuries, although the technician's interview did not cover non-visible injuries. (N.T. 10/8/91 at 50, 58-59.) Defense counsel put on witnesses who claimed to have seen Gibson at his arraignment with a swollen lip. (N.T. 10/7/91 at 171, 182, 193, 202.) Some

---

[4] Note that the .45 caliber automatic believed to have been used by Gibson was found in Green's bureau, not under his mattress. See Commonwealth v. Gibson, 951 A.2d 1110, 1140 (Pa. 2008). A gun was found under Green's mattress, but that was a .38 caliber revolver. (N.T. 10/4/91 at 147.)

of these witnesses gave conflicting testimony about whether Gibson's swollen lip could be seen in a photograph that was shown to them. (N.T. 10/7/91 at 188, 196-97, 213-14.)

In his trial testimony, Gibson denied ever owning a .45 caliber automatic and testified that "that was [Green's] gun." (N.T. 10/7/91 at 90.) As noted, Gibson did concede in his trial testimony that he possessed a gun in the bar and struggled over it with bouncer Keith Simmons, but claimed he never shot the gun and that it was not a .45 but a .38 caliber automatic, which he later threw in the river. (N.T. 10/7/91 at 89.) Gibson explained that he disposed of the gun because he did not want to be caught running with it after the shooting. (N.T. 10/7/91 at 131-32.) He could not recall where along the river he threw the gun. (N.T. 10/7/91 at 133.)

Defense witness Lamont Jones testified that Gibson used to carry a .38 caliber gun, but, contrary to Gibson, described it as a revolver. (N.T. 10/7/91 at 234-35.) When told on cross examination that Gibson had identified his gun as an automatic, Jones acknowledged that he "could be wrong" but remembered it as a revolver. (N.T. 10/7/91 at 234-36.)

Two defense witnesses, Lamont Jones and Oquea Collins, testified that the .45 caliber gun recovered from Green's apartment belonged to Green. (N.T. 10/7/91 at 222-23; N.T. 10/8/91 at 75-76.) Jones and a detective called on rebuttal disagreed over whether, during a discussion in the hallway, Jones incorrectly identified Tancemore's 9 mm as Green's .45. (N.T. 10/7/91 at 239 (Jones), 260 (Detective Duffy).) Collins initially testified that Green "always carried" the gun that was, apparently unbeknownst to her, Tancemore's 9 mm. (N.T. 10/8/91 at 75.) Collins then admitted she made an error and testified that Green carried the .45 and kept another gun (a .38 caliber revolver) under his bed. (N.T. 10/8/91 at 75-76, 82.) The identification of exhibits is somewhat unclear in the trial transcript, but it appears the .38 caliber revolver that Collins identified as

Green's was actually found in Tancemore's apartment and was not the one found under Green's mattress. (See N.T. 10/8/91 at 88-89, 91, 125.)

Sometime before the close of evidence, the prosecutor advised the judge he would request an instruction on accomplice liability. The judge indicated that request would be denied, stating, "[a]ccomplice liability does not apply here." (N.T. 10/7/91 at 267-68.) Although the record does not reveal how or when, the judge apparently changed course because the jury was, ultimately, instructed on accomplice liability, as described below. With respect to felony murder, the prosecutor asked for an instruction both based on Gibson having "acted alone" and based on him having been a "co-felon." The judge agreed there was "some evidence" to support either theory. (N.T. 10/7/91 at 269-70.)

In closing, defense counsel did not advocate for any particular version of events but highlighted deficiencies in the Commonwealth's evidence. In particular, defense counsel stressed that none of the witnesses who testified to having seen Gibson shooting in the bar made a similar statement to police identifying Gibson as the shooter. (N.T. 10/8/91 at 107.) Defense counsel did not dispute the inference drawn from the ballistics and medical evidence that both victims were killed by .45 caliber bullets.

The prosecutor's closing argument summarized the Commonwealth's theory of the case: Gibson tried to rob Simmons and shot and killed Dukes and Nixon. The prosecutor conceded that Gibson likely did not intend to shoot Nixon, but argued that Gibson was nonetheless guilty of first degree murder as to Nixon under the doctrine of "transferred intent" because he intended to shoot and kill Dukes as Dukes was reaching for his gun. (N.T. 10/8/91 at 132-33.) Critically, the prosecutor never asked the jury to find Gibson guilty of first degree murder on the theory that he was an accomplice to a robbery. For example, the prosecutor never suggested that the jury could

consider a version of events in which Gibson did not shoot a .45 caliber gun but Green did. The

prosecutor did, however, generally discuss accomplice liability with the jury as follows:

> You will also hear the Judge charge you on accomplice liability, which is like conspiracy liability. You have probably heard that term on television shows when you hear he is an accomplice before the fact and after the fact. What accomplice means is, this is a person who assists another in the crime without the necessity of any agreement, either an overt agreement where they say let's rob the bar, or an unspoken agreement where they say let's take the guy with the powder, or non-specific agreement, but where a person acts, a person aids, abets, solicits, directs or promotes the facilitation of a crime with the intent for that crime to occur. That is an accomplice. A conspirator is necessarily an accomplice, but an accomplice need not be a conspirator. What I have here is both. They assisted each other. One was directed by the other in the commission of this offense, and they are also conspirators because they agreed to commit these acts, then they took steps to complete their acts, to complete their robbery and murder, because they are responsible for the outcome ever [sic] their acts after they go in there intending to rob and then they murder to effect their escape from robbery.

(N.T. 10/8/91 at 133-34.) Yet the prosecutor did not suggest how the jury might use accomplice

liability to reach its verdict on any of the charges.

The trial court instructed the jury on first degree murder as follows:

> First degree murder is a murder in which the killer has the specific intent to kill. You may find the defendant guilty of first degree murder if you are satisfied that the following three elements have been proven beyond a reasonable doubt:

> First, that Frederick Dukes and Vernae Nixon are dead.

> Second, that the defendant killed Frederick Dukes and Vernae Nixon.

> And third, that the defendant did so with the specific intent to kill and with malice.

(N.T. 10/8/91 at 158-59.)

The trial court also instructed the jury on accomplice liability, giving the following instruc-

tion that forms the basis of Gibson's present challenge:

> You may find the defendant guilty of a crime without finding that he personally engaged in conduct required for the commission of that crime even that he was personally present when the crime was committed. A defendant is guilty of a

crime if he is an accomplice of another person who commits the crime. A defendant does not become an accomplice merely by being present at the scene or knowing about the crime. He is an accomplice if with the intent of promoting or facilitating the commission of the crime, he solicits, commands, encourages, requests the other person to commit it, or he aids, agrees to aid or attempts to aid the other person in planning or committing it. …

You may find the defendant guilty of a crime on the theory he was an accomplice, as long as you are satisfied beyond a reasonable doubt that the crime was committed and that the defendant was <u>an accomplice</u> of the person who committed it. It does not matter whether the person you believe committed the crime has not been prosecuted or convicted.

(N.T. 10/8/91 at 172-73 (emphasis added).)

The jury returned a verdict of guilty on all counts.

## II.   <u>PROCEDURAL HISTORY</u>

Gibson initially challenged the accomplice liability instruction on direct appeal, arguing that it allowed his conviction for first degree murder without a specific intent to kill. The Pennsylvania Supreme Court rejected that claim with little discussion other than citing to past cases in which similar language had been approved. <u>See</u> <u>Commonwealth v. Gibson</u>, 688 A.2d 1152, 1168 (Pa. 1997).

Gibson renewed his challenge to the accomplice liability instruction on collateral review under Pennsylvania's Post Conviction Relief Act (PCRA). The Pennsylvania Supreme Court again rejected that claim, finding that "the instruction accurately apprised the jurors of the applicable law." <u>Commonwealth v. Gibson</u>, 951 A.2d 1110, 1142 (Pa. 2008). The court's opinion focused on whether the instruction permitted the jury to convict Gibson on a theory that "specific intent to kill one victim would suffice" as to "both victims." <u>Id.</u> The opinion did not expressly address whether the jury could have convicted Gibson of first degree murder on the theory that he was an accomplice to a robbery in which a first degree murder was committed.

Gibson then brought the present federal habeas petition. Ground Five of that petition again challenges the trial court's accomplice liability instruction, arguing, as before, that it deprived Gibson of his Due Process right to have the prosecution prove every element of the crime beyond a reasonable doubt and that counsel was ineffective for failing to object to it. During the pendency of the habeas proceeding, Gibson moved for summary judgment on Ground Five.

## III.   LEGAL STANDARD

A federal district court may consider a petition for a writ of habeas corpus on behalf of a person convicted by a state court only on the ground that the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In reviewing such a petition, federal courts must give "deference" to the determinations of the state courts. Harrington v. Richter, 562 U.S. 86, 101 (2011). In particular, where a claim was previously adjudicated in state court, a federal court on habeas review may not upset the state court's decision unless an exception enumerated in § 2254(d) applies. Those exceptions are: (1) the state court's decision "was contrary to … clearly established Federal law, as determined by the Supreme Court of the United States"; (2) the state court's decision "involved an unreasonable application" of such law; or (3) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d).

In addition, Congress has placed limits on the ability of habeas petitioners to develop new evidence to support their claims in federal court when they failed to develop that evidence in state court. See § 2254(e)(2). In such a case, the federal court may not hear additional evidence unless the petitioner meets "one of two narrow exceptions, see 28 U.S.C. § 2254(e)(2)(A), and demonstrates that the new evidence will establish his innocence 'by clear and convincing evidence,' § 2254(e)(2)(B)." Shinn v. Ramirez, 142 S. Ct. 1718, 1728 (2022).

Summary judgment is an available procedure in habeas proceedings. Blackledge v. Allison, 431 U.S. 63, 80-81 (1977). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if there is evidence from which a reasonable factfinder could return a verdict for the non-moving party, and a dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" that show a

genuine issue of material fact or by "showing that the materials cited do not establish the absence

or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## IV. **DISCUSSION**

Gibson claims he is entitled to habeas relief without a hearing because the trial court's

accomplice liability instruction permitted the jury to convict him of first degree murder without

finding he had a specific intent to kill, contrary to Pennsylvania law. See Commonwealth v. Huff-

man, 638 A.2d 961, 962 (Pa. 1994). In Gibson's view, the instruction implied that an accomplice

for one purpose was an accomplice for all purposes, such that if the jury concluded he was an

accomplice to a robbery, it could have found him guilty of first degree murder on the ground that

a first degree murder was committed and Gibson was "an accomplice" of the person who commit-

ted it. The DAO concedes that the instruction was improper but asserts that any error was harmless

because the evidence and arguments at trial would not have led the jury to find guilt on the theory

Gibson suggests.[5]

Although the propriety of jury instructions is normally a matter of state, rather than federal,

law, "a jury instruction violates due process" if it relieves the prosecution of the burden of proving

every element of the state-law crime beyond a reasonable doubt. Middleton v. McNeil, 541 U.S.

433, 437 (2004) (per curiam). But not every error in an instruction entitles a defendant to habeas

relief. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). "The question is whether the ailing instruc-

tion so infected the entire trial that the resulting conviction violates due process." Middleton, 541

U.S. at 437 (quotation marks and alterations omitted).

---

[5] Gibson argues that the DAO forfeited its harmless error argument by not raising it sooner. How-
ever, the DAO's first supplemental brief did argue that "any ambiguity in the accomplice liability
charge was harmless." (ECF No. 159 at 10.)

If a reviewing court determines that an instruction was erroneous, it must then decide whether the error was harmless. Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997). "In a collateral proceeding, the standard for harmlessness is whether the error had substantial and injurious effect or influence in determining the jury's verdict." Bronshtein v. Horn, 404 F.3d 700, 712 (3d Cir. 2005) (quotation marks omitted). If the reviewing court is left with "grave doubt" as to whether the error was harmless, it should treat the error as harmful. O'Neal v. McAninch, 513 U.S. 432, 435 (1995).

Gibson also argues that he was deprived of his right to effective assistance of counsel because trial counsel did not object to the erroneous instruction. To succeed on that claim, Gibson must show that counsel performed deficiently and that he was prejudiced as a result. Strickland v. Washington, 466 U.S. 668, 687 (1984). Prejudice is shown if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

### A.      Procedural Default

Federal habeas courts may not review a claim of error if a state procedural rule provides an adequate and independent ground for upholding the decision of a state court rejecting the claim. Coleman v. Thompson, 501 U.S. 722, 732 (1991). The DAO initially argued that Gibson's Ground Five was procedurally defaulted because it was not raised in state court. At oral argument and in its first supplemental brief, the DAO changed positions and now concedes that the claim was adequately presented to the Pennsylvania Supreme Court and denied on the merits, such that procedural default does not apply.

I agree with the parties that Gibson's Ground Five is not procedurally defaulted. Gibson's brief to the Pennsylvania Supreme Court on appeal from the denial of his PCRA petition argued that "[t]he language of the accomplice liability charge … left unanswered for the jury the question

16

of which crime" Gibson was an accomplice to, such that "[t]he jury was never instructed that to

find the defendant guilty as a 'co-conspirator/accomplice' to first degree murder, they had to find

that [Gibson] had the specific intent to commit murder." The brief also asserted that this instruction

"deprived [Gibson] of his due process right to have the Commonwealth prove each and every

element beyond a reasonable doubt," with appropriate citations to Supreme Court precedent. (Brief

at 64-65.) Similar briefing was found adequate to preserve a claim in Mathias v. Superintendent

Frackville SCI, 876 F.3d 462, 479-80 (3d Cir. 2017). Although the DAO argued at the time that

Gibson had defaulted the claim by failing to raise it in the court below, the Pennsylvania Supreme

Court did not find the claim defaulted and instead addressed it on the merits, concluding that the

instruction "accurately apprised the jurors of the applicable law." Gibson, 951 A.2d at 1141-42.

Where a state court declines to find a claim defaulted, a federal court will defer. Cone v. Bell, 556

U.S. 449, 468-69 (2009). Gibson's Ground Five is therefore not procedurally defaulted.

###### B.     Whether Deference Applies to the State Court's Denial of Gibson's Claim

Although the DAO concedes that the jury instruction was erroneous, it asserts that any

error was harmless. The parties disagree as to whether I should decide that question de novo or

with deference to the resolution of the Pennsylvania state courts.

Federal habeas courts must ordinarily defer to the factual and legal determinations of state

courts. See Shinn v. Kayer, 141 S. Ct. 517, 523 (2020) (per curiam). Thus, state-court decisions

will not be disturbed unless contrary to or an unreasonable application of clearly established fed-

eral law, or based on an unreasonable interpretation of the facts. 28 U.S.C. § 2254(d). In certain

situations, however, federal habeas courts will review claims of error de novo, such as where the

state courts did not decide those claims on the merits. See Bronshtein, 404 F.3d at 710 n.4.

The parties disagree as to whether the Pennsylvania state courts rendered a decision on the

merits as to Gibson's Ground Five. The Pennsylvania Supreme Court determined that the

challenged accomplice liability instruction "accurately apprised the jurors of the applicable law." Commonwealth v. Gibson, 951 A.2d 1110, 1141-42 (Pa. 2008). However, Gibson asserts that this was not a ruling on the merits because the "applicable law" in question was state, not federal law. See Simpson v. Wetzel, 485 F. Supp. 3d 545, 571 (E.D. Pa. 2020). The DAO disagrees, noting that there is a presumption that claims presented to a state court were denied on the merits. See Johnson v. Williams, 568 U.S. 289, 298 (2013).

I conclude that deference does not apply to the question of harmless error because that question was not reached by the Pennsylvania Supreme Court. Where a state court gives a reason for its decision, a federal habeas court owes deference to the reason actually given but not to alternative reasons that could have been offered to support the state court's decision. Dennis v. Sec'y, Pennsylvania Dep't of Corr., 834 F.3d 263, 283 (3d Cir. 2016). In this case, the state court gave a reason for rejecting Gibson's claim on accomplice liability: the jury instruction was, in its view, correct. Having decided Gibson's appeal on that basis, the Pennsylvania Supreme Court did not reach whether any possible error would have been harmless. For that reason, the question of harmless error is subject to de novo review in federal court. See id.

### C.    Whether Any Error in the Jury Instruction Was Harmless

Applying de novo review, I conclude that any error in the accomplice liability instruction was harmless because it would not have caused the jury to convict Gibson of first degree murder on the theory that he was an accomplice to a robbery. The alleged error in the instruction would only have been harmful if the jury believed the DAO's witnesses that Gibson attempted to rob Keith Simmons, but believed Gibson that Green shot the .45 caliber gun. Neither party at trial offered this version of events to the jury. Moreover, the DAO's evidence that Gibson shot the .45 caliber gun that killed both victims was strong—including a signed statement from Gibson himself to that effect. And Gibson's efforts to place the .45 in Green's hands lacked evidentiary support.

18

Finally, the idea that Gibson could be found guilty of murder on the theory that he was an accomplice to the robbery of Keith Simmons was not obvious, and it is unlikely that the jury would have discovered this theory on its own without prompting from the lawyers, who did not advocate it.

Gibson's Ground Five asserts that the trial court's accomplice liability instruction impermissibly relieved the Commonwealth of its burden to prove specific intent to kill, an element of first degree murder, beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364 (1970). For that scenario to occur, the jury would have had to conclude that Gibson "was an accomplice of the person who committed" the murder because Gibson was an accomplice to the robbery of Keith Simmons, while concluding that Gibson lacked the intent to kill Dukes and Nixon. (N.T. 10/8/91 at 172-73.) Therefore, even if the jury had doubted that Gibson was the fatal shooter, the alleged error in the accomplice liability instruction would not have been harmful unless the jury credited Keith Simmons that Gibson pulled a gun on him, but disbelieved Simmons's consistent identification of the gun as a .45. And the jury would have had to discredit Gibson's signed confession to shooting a .45 in the bar, while nevertheless deciding that Gibson was lying about how the altercation with Simmons began. For that reason, there was only a very narrow path for the jury to find Gibson guilty of murder under a theory that he was an accomplice to the robbery.

Gibson's attempt to demonstrate that it was actually Green who shot the .45 was implausible and would not likely have led the jury to conclude that Gibson could only be guilty of murder as an accomplice to robbery. Gibson's theory that Green shot the .45 was inconsistent with the testimony of all four witnesses from the bar, none of whom even mentioned a third individual with Gibson and Tancemore. While some witnesses had previously identified Tancemore as the fatal shooter, this was unsurprising as Tancemore did, in fact, shoot a gun, yet no witness suggested that there was a shooter other than Gibson and Tancemore. While Gibson attempted to demonstrate

that the .45 caliber automatic was Green's through a witness (Collins) who claimed to be Green's girlfriend and to be familiar with the gun, she gave inconsistent answers and identified a .45, a 9 mm, and a .38 as being one of Green's alleged two guns. Therefore, it is extremely unlikely the jury would have concluded that Green shot the .45 caliber bullets that killed both victims.

Hardest for Gibson to overcome was his signed statement confessing to shooting a .45 in the bar. Gibson's response was to claim that his statement was fabricated and he signed it only because Detective Walsh beat him. (N.T. 10/7/91 at 99-104.) But defense witnesses who claimed to have seen Gibson's swollen lip the day of his arraignment disagreed as to whether this injury could be seen in a photograph. Gibson's alternative story was that he owned a .38 caliber automatic that he threw in the river right after the shooting—even though it was not the murder weapon. (N.T. 10/7/91 at 131-32.) A defense witness who claimed to have seen Gibson with a .38 caliber gun described it, contrary to Gibson, as a revolver. (N.T. 10/7/91 at 234-35 (Jones).)

Moreover, even aside from Gibson's confession, the DAO's evidence that Gibson shot the .45 was strong. Keith Simmons, who struggled with Gibson on the floor, identified Gibson's gun as a .45 caliber. (N.T. 10/3/91 at 123, 143.) Simmons's identification was particularly credible given that he told police the gun was "like a .45" at a time when, as far as the trial record reveals, Simmons would have no reason to know that Dukes was shot by a .45 caliber bullet or that Tancemore would die by suicide. Thus, Simmons's testimony was not susceptible to Gibson's theory that police wanted to incriminate Gibson because they could not charge Tancemore. (Gibson never had a theory for why the police would want to exonerate Green, as the prosecutor pointed out in closing.) And, as noted, several witnesses testified to seeing Gibson shoot a gun from near the front of the bar.

The DAO's ballistics evidence was also strong that both victims were killed by .45 caliber bullets. Dukes bled to death from the .45 caliber bullet that pierced his aorta, and, although no bullet was found in Nixon's body, the .45 caliber gun was shot three times with two bullets landing on the floor as if they had passed through human flesh, while two of Tancemore's 9 mm bullets passed through the bar's ceiling and one was found in the Police Administration Building and assumed to have fallen out of a witness's clothing. Defense counsel did not challenge this evidence in closing or dispute the inference that both victims were killed by .45 caliber bullets. Thus, the jury was not offered a story in which Gibson shot and killed Dukes but not Nixon. But even if the jury had concluded that one victim—Nixon—may have been killed by Tancemore's 9 mm bullet, this inference would not have triggered the specific problem with the accomplice liability instruction that underlies Gibson's Ground Five. This is because the jury would still have found that Gibson intentionally shot at Dukes and thus had the specific intent to kill. While Gibson did, in state court, challenge the application of "transferred intent" among himself and Tancemore as applied to the two victims, Gibson's Ground Five is limited to an argument that the jury may have found him guilty of first degree murder as an accomplice to robbery, a crime that does not have intent to kill as an element.

Finally, the prosecutor never suggested to the jury how it might find Gibson guilty of murder as an accomplice to robbery. Although the prosecutor summarized the law of accomplice liability generally in closing, the jury was never asked to apply that law to the robbery and murder charges together. In fact, the only clue the prosecutor gave the jury about how it might use accomplice liability was to note that between Gibson and Tancemore, one unspecified person "was directed by the other in the commission of this offense." (N.T. 10/8/19 at 134.) Gibson points out that the prosecutor also told the jury about co-conspirator liability (despite the trial court not

21

instructing on it), stating that "each conspirator is equally guilty of all the acts of the other; the crime of one is the crime of both or all." (N.T. 10/8/91 at 129:3-5.) But again, this statement was untethered from the evidence and no suggestion was given about how the jury might apply it to the facts. The lack of argument from the prosecutor is especially important given that the alleged error in the accomplice liability instruction was not obvious on the facts of this case and would have taken some creativity and effort to spot. Absent any suggestion from the lawyers, it is unlikely the jury would have picked apart the instruction to uncover a narrow path to convicting Gibson of first degree murder as an accomplice to robbery.

For these reasons, I conclude that, even assuming the accomplice liability instruction was erroneous, it did not have a "substantial and injurious effect or influence in determining the jury's verdict." Bronshtein, 404 F.3d at 712. Any such error was therefore harmless and does not entitle Gibson to habeas relief. For the same reason, Gibson is unable to prove his related claim for ineffective assistance of counsel because any possible error by counsel in failing to object to the instruction would not have caused prejudice.

V.    <u>**CONCLUSION**</u>

For the reasons set out above, Gibson's motion for summary judgment will be denied.

An appropriate order follows.